UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

RICHARD ANGUS BRADLEY,

      Plaintiff,

v.                               Case No:  2:14-cv-627-FtM-38CM

GEO CARE, LLC., GEO, INC. and
JAQUES LAMOUR,

      Defendants.

_____/

## OPINION AND ORDER[1]

This matter comes before the Court upon the following:

> The motion for summary judgment filed by Defendants Jacques
> Lamour, Geo Group, Inc., and Geo Care LLC (Doc. 160, filed
> November 30, 2016);[2]
>
> Plaintiff's response in opposition to the defendants' motion for
> summary judgment (Doc. 165, filed February 21, 2017); and
>
> Plaintiff's report on unanswered discovery requests and request
> to file a motion to compel (Doc. 167, filed March 13, 2017).

---

[1] Disclaimer:  Documents filed in CM/ECF may contain hyperlinks to other documents or Web sites.  These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other Web sites, this court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

[2] The defendants filed "corrected" versions of the motion for summary judgment and exhibits (Doc. 162) which merely corrected some citations and scrivener errors in the original motion for summary judgment and exhibits.  Because the original motion (Doc. 160) is the pending motion before this Court and is substantively identical to the amended versions, in order to avoid confusion, this Order is directed towards docket entry 160. However, the analysis applies equally to docket entry 162.

For the reasons given in this Order, the motion for summary judgment filed by the defendants (Doc. 160) is granted, and this case is dismissed with prejudice. Plaintiff's request for leave to seek additional discovery (Doc. 167) is denied.

## I.     Background and Procedural History

Plaintiff, an involuntary civilly committed resident of the Florida Civil Commitment Center ("FCCC") in Arcadia, Florida,[3] initiated this action on October 27, 2014 by filing a *pro se* complaint against Defendants Ms. Baker, Timothy Budz, Carolyn Dudley, Flavia Epps, George Zoley, GEO Inc., GEO Care, LLC, Rick Hebert, Rebecca Jackson, Kristen Kanner, Jacques Lamour, Melissa Masters, Richard Miraglia, Cindy Neads-Noriega, Sharon Pimley-Fong, Bill Price, Paul Pye, Dottie Riddle, Kimberly Roberts, Donald Sawyer, Darella Sharpe, and David Wilkins (Doc. 1). Plaintiff's amended complaint (Doc. 126) is the operative complaint before the Court. On April 27, 2016, all defendants were dismissed from this action with the exception of Defendants Jacque Lamour, GEO Care, LLC and GEO, Inc., collectively the GEO defendants (Doc. 142). In the dismissal order, the Court noted:

> Plaintiff asserts that the GEO defendants have a policy or custom of basing medical decisions on cost, rather than medical necessity (Doc. 126 at 21). Plaintiff claims that Defendant Lamour "made decisions on Plaintiff's care based on the guidelines set forth by the corporation employing him, and not on sound medical judgment." *Id.* at 21. A review of Plaintiff's allegations indicates that he communicated with, or was examined by, a medical professional for his Fuch's Dystrophy at least thirty-five times in the two and a half years

---

[3]   Florida's Involuntary Civil Commitment for Sexually Violent Predators Act was enacted in Florida "to create a civil commitment procedure for the long-term care and treatment of sexually violent predators." Fla. Stat. § 394.910, et seq. A person who is found, after a hearing, to be a "sexually violent predator" is "committed to the custody of the Department of Children and Family Services for control, care, and treatment until such time as the person's mental abnormality or personality disorder has so changed that it is safe for the person to be at large." *Id.* at § 394.917.

he was at the FCCC before he filed this complaint. This included numerous outside consultations and six surgeries. Likewise, seven years passed from the diagnosis of Plaintiff's condition until his residency at the FCCC whereas Plaintiff's first eye surgery occurred less than ten months after his commitment.

Defendants urge that the volume and speed of care provided to Plaintiff appears to belie his allegations of deliberate indifference against these defendants (Doc. 133 at 18-19). This point is well taken. However, a doctor's choice of the "easier and less efficacious treatment" for an objectively serious medical condition can still amount to deliberate indifference for purposes of the Eighth Amendment. *Estelle*, 429 U.S. at 104 & n. 10. While the "cost of treatment alternatives is a factor in determining what constitutes adequate, minimum-level medical care, . . . medical personnel cannot simply resort to an easier course of treatment that they know is ineffective." *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) (internal citations omitted); *compare Peralta v. Dillard*, 744 F.3d 1076, 1084 (9th Cir. 2014) ("A prison medical official who fails to provide needed treatment because he lacks the necessary resources can hardly be said to have intended to punish the inmate.").

Accordingly, at this stage of the proceeding, the Court cannot conclude that Plaintiff has not stated a plausible deliberate indifference claim against Defendants Lamour, GEO, Inc., and GEO Care, LLC based upon the delay in treating his Fuch's Dystrophy. Plaintiff will be allowed to develop his Eighth Amendment deliberate indifference claim against these defendants.

(Doc. 142 at 22-23). Both GEO defendants filed an answer and affirmative defenses to the amended complaint (Doc. 143), and on May 14, 2016, the parties were directed to conduct discovery (Doc. 31).

On November 30, 2016, the defendants filed a motion for summary judgment (Doc. 160). Plaintiff was directed to respond to the motion (Doc. 161). Plaintiff was cautioned that: (1) his failure to respond to the motions would indicate that they were unopposed; (2) all material facts asserted by the defendants would be considered admitted unless controverted by proper evidentiary materials; and (3) Plaintiff could not rely solely on the

allegations of his pleadings to oppose the motions ([Doc. 46](#)) (citing *Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985)). Plaintiff filed a response in opposition to the defendants' motions on February 21, 2017 ([Doc. 165](#)). In his response, Plaintiff complained that certain defendants and non-parties to this action failed to respond to his discovery requests. *Id.* In an abundance of caution, the Court directed Plaintiff to describe the discovery sought that was denied ([Doc. 166](#)). In his response, Plaintiff asserts that he sent numerous letters and requests to non-parties seeking information regarding his medical records ([Doc. 167](#)). Plaintiff now requests permission to file a motion to compel discovery. *Id.*

## II.    Pleadings

### a.    Amended Complaint

The claims in Plaintiff's amended complaint are directed towards the quality of his medical care and the accommodation provided him at the FCCC facility for his visual disability. However, the remaining claims are directed towards the allegedly delayed and inadequate treatment for Plaintiff's eye disease ([Doc. 142](#)). Therefore, only the factual allegations surrounding those claims will be discussed in this Order.

In September of 2005, prior to his commitment to the FCCC, Plaintiff was diagnosed with Fuch's Epithelial Dystrophy ("Fuch's Dystrophy"), a degenerative eye disease ([Doc. 126 at 9](#)). In October of 2006, Plaintiff was incarcerated by the State of Florida, and an optometrist for the Florida Department of Corrections ("FDOC") confirmed the diagnosis of Fuch's Dystrophy on October 30, 2006. *Id.* Between that date and April 4, 2012, Plaintiff received care for his condition from the FDOC. *Id.* at 9-10.

Plaintiff arrived at the FCCC on April 20, 2012 ([Doc. 126 at 10](#)). Plaintiff informed nurses in the medical department of his eye condition, and offered his medical records.

*Id.* He was told that official copies of the records would be requested if needed. *Id.* Plaintiff asserts that the FCCC routinely refuses to accept hand-delivered medical records from residents. *Id.* at 11.

On June 13, 2012, Plaintiff was examined by FCCC contract optometrist Dr. Brennon who confirmed Plaintiff's diagnosis of Fuch's Dystrophy (Doc. 126 at 11). Dr. Brennan also refused to take Plaintiff's medical records at that time. *Id.* On July 11, 2012, Dr. Brennon diagnosed Plaintiff with Advanced Fuch's Corneal Dystrophy. *Id.*

In September of 2012, Plaintiff awoke with no clear vision in his right eye (Doc. 126 at 11). Plaintiff went to see Defendant Dr. Lamour who told him that he would see Dr. Brennan, the optometrist, soon. *Id.* In early October, Plaintiff still had no clear vision in his right eye, so he went to see Nurse Baker who saw no notes in Plaintiff's records regarding a visit to the optometrist. *Id.* The nurse wrote in Plaintiff's record that he needed to be seen by an eye doctor soon. *Id.*

On November 19, 2012, Plaintiff wrote a letter to Dr. Brennan, informing him of the loss of clear vision in his right eye (Doc. 126 at 13). Plaintiff was examined by Dr. Brennan on December 12, 2012. *Id.* Brennan confirmed the loss of clear vision in Plaintiff's right eye and noted that Plaintiff had developed secondary glaucoma. *Id.* Dr. Brennan reviewed Plaintiff's earlier medical records and prescribed several eye medications. *Id.* at 14.

On December 21, 2012, Defendant Lamour referred Plaintiff to an outside specialist, Dr. Spadafora (Doc. 126 at 14). On January 9, 2013, Defendant Lamour filed a "referral summary" that revealed a diagnosis of advanced glaucoma, cataracts, and Fuch's Corneal Dystrophy. *Id.*

On February 12, 2013, Plaintiff received surgery on his right eye (Doc. 126 at 15).

On February 13, 2013, Dr. Spadafora diagnosed nuclear cataract worsening, glaucoma, open-angle, primary, worsening, Glaucoma, Severe Stages, Fuch's Corneal Dystrophy, worsening. *Id.* On February 27, 2013, Defendant Lamour sought a referral in preparation for a right cornea transplant. *Id.* at 15. On March 5, 2013, Plaintiff returned for additional surgery on his right eye due to complications. *Id.* On March 5, 2013, Defendant Lamour filed a referral for Plaintiff to have a second surgery on his right eye. *Id.* On March 7, Defendant Lamour filed a referral for a follow-up visit. *Id.* On April 24, 2013, Defendant Lamour filed a referral for another follow-up visit on Plaintiff's right eye. *Id.* On May 2, 2013, Plaintiff's eye medication ran out, and Plaintiff had to request a refill. *Id.* On June 1, 2013, Plaintiff complained to Defendant Lamour about the eye medication, and Defendant Lamour told him that Plaintiff had not attended a chronic clinic, implying that it was Plaintiff's fault that the prescription refill was untimely. *Id.* at 16. On June 1, 2013, Plaintiff wrote Dr. Brennan to ask for help to correct the eye medication situation, but he never received a response. *Id.*

On August 2, 2013, Plaintiff asked Dr. Spadafora (Spadafora) if he would change his opinion regarding the loss of vision in Plaintiff's right eye "or had too much damage already occurred before [he was] able to perform the surgeries?" (Doc. 126 at 16). Plaintiff received no response to the letter. *Id.* On September 21, 2013, Plaintiff requested that Defendant Lamour schedule an examination with Dr. Spadafora. *Id.* at 17.

On October 22, 2013, a "full exam" was performed by Dr. Spadafora, and it was noted that Plaintiff's cataract and glaucoma were worsening and that Plaintiff still suffered from Fuch's Dystrophy (Doc. 126 at 17). It was also noted that the "visual limitations are affecting the patient's ability to perform desired activities and cannot be improved significantly with glasses." *Id.* Dr. Spadafora told Plaintiff that his vision would not

improve and that, had he cared for Plaintiff sooner, he would face a different outcome. *Id.* On November 19, 2013, Dr. Spadafora reported that Plaintiff suffered "severe glaucomatous damage." *Id.*

On December 11, 2013, Plaintiff was examined by Dr. Brennan who diagnosed cataracts, cornea transplant, glaucoma, and Fuch's corneal Dystrophy (Doc. 127 at 17). On January 30, 2014, Plaintiff was examined by Dr. Spadafora whose diagnosis did not change. *Id.* On January 30, 3014, Defendant Lamour wrote a referral for a consultation for cataract removal and cornea transplant on Plaintiff's left eye. *Id.* at 18. On April 22, 2014, Plaintiff had surgery to remove the cataract in his left eye, but he was unable to have the cornea transplant on that date. *Id.* The next day, Plaintiff was given medication to reduce the pressure in his eye, and the surgery was performed. On April 30, 2014, Plaintiff experienced a discharge coming from his left eye. Defendant Lamour called Dr. Spadafora, and Plaintiff was seen the next day. *Id.* Plaintiff was given precautionary antibiotics. *Id.* at 19.

On May 7, 2014 and May 15, 2014, Plaintiff was taken to the Community Eye Center where pig lenses were implanted on his eye (Doc. 127 at 17). A third pig lens was implanted on May 29, 2014. *Id.* Plaintiff was taken to the Community Eye Center for another checkup on June 5, 2014. *Id.* On June 19, 2014, Plaintiff was taken to the Community Eye Center where he was told that his condition was improving, and several stitches were removed. *Id.* at 20. Plaintiff had another checkup at the Community Eye Center on July 21, 2014. *Id.* On August 21, 2014, Plaintiff was examined by Dr. Spadafora who was pleased with the healing process. *Id.* Dr. Spadafora told Plaintiff that his right eye "had a form of a stroke caused by high pressures in this eye going untreated, which caused permanent damage to the eye's nerves (and disfigurement)." *Id.*

On October 2, 2014, Plaintiff visited the Community Eye Center and Dr. Spadafora was pleased with the healing process. *Id.*

As relief, Plaintiff seeks monetary damages and a declaratory judgment that the defendants engaged in misconduct, were grossly negligent, and deliberately indifferent ([Doc. 126 at 26](#)).

### b.     Motion for Summary Judgment

The defendants filed a motion for summary judgment in which they describe the medical care Plaintiff received for his Fuch's Dystrophy ([Doc. 160](#)).   The defendants argue that Plaintiff's claim is based upon his mere disagreement with the care provided. *Id.* at 15.   They further argue that the records do not indicate any delay in the treatment of Plaintiff's eye condition and that he has not produced evidence that any perceived delay worsened his condition.   *Id.* at 15-17.   Defendants also urge that the medical records contradict the hearsay statements in Plaintiff's complaint regarding whether he suffered a "stroke" in his right eye caused by inattention.   *Id.* at 20-21.   Finally, they note that each time an eye procedure was recommended, it was approved by Defendant Lamour, showing that the choice of treatment could not have been based upon financial considerations.   *Id.* at 21-22.

In support of their motion for summary judgment, the defendants attach Plaintiff's FCCC medical records ([Doc. 160-1](#); [Doc. 160-2](#); [Doc. 160-3](#)) and Defendant Lamour's affidavit ([Doc. 160-4](#); "Lamour Aff.").

### c.     Plaintiff's Response

In his response to the Plaintiff's motion for summary judgment ([Doc. 165](#)), Plaintiff asserts that the defendants have not refuted his allegation that the FCCC does not accept records from the FDOC.   *Id.* at 2.   He asserts that GEO spokesperson Josh Bulfin,

stated in an interrogatory that the records are accepted if provided, but that "Plaintiff can supply over 100 affidavits from current residents at the facility to this affect." *Id.* at 2. Nevertheless, Plaintiff does not actually provide a single affidavit from the current residents, nor does he attach the alleged interrogatory responses from Bulfin. Plaintiff reasserts his contention that, had the FCCC accepted the medical records from the FDOC when he was initially admitted to the FCCC, there would not have been a seven month delay in evaluating his condition and he would not have lost vision in his eye. *Id.* In support of his allegations, he attaches medical records from his time as a prisoner in the FDOC showing that he suffered from Fuch's Dystrophy for many years prior to his civil commitment (Doc. 165-1).

Plaintiff also argues that the Court's refusal to appoint counsel hindered him in preparing a response to the defendants' motion for summary judgment due to his vision difficulties. He urges that he has been unable to force responses to his discovery requests due to his lack of counsel (Doc. 165 at 7). Although the deadline for discovery had passed, out of concern for Plaintiff's *pro se* status, the Court ordered Plaintiff to explain this assertion:

> On page seven of the response, Plaintiff asserts that he requested discovery from the FDOC, the FCCC and GEO Care, LLC, but that "[m]ost of these inquiries have been unanswered, which distinctly disadvantages Plaintiff in the instant situation." Notably, Plaintiff has filed no motion to compel discovery with this Court. Moreover, Plaintiff does not indicate what the unanswered discovery requests would have revealed, nor does he point to specific facts he believes would have shown his entitlement to relief on the single medical deliberate indifference claim at issue in this case.
>
> The time allowed for the parties' motions relating to discovery has passed. However, the Court recognizes that Plaintiff is proceeding *pro se* in this action. Accordingly, in an abundance of caution, within **FOURTEEN (14) DAYS** from the date on this Order, Plaintiff shall describe <u>in detail</u> the

> discovery sought that has been denied; the dates the
> discovery was requested; and the manner in which the
> request was made. Plaintiff shall indicate how the missing
> discovery would have shown the existence of a material issue
> of fact on the medical deliberate indifference claim at issue in
> this case. Should the Court conclude that the allegedly
> undisclosed discovery was relevant to the instant motion for
> summary judgment, Plaintiff will be allowed to file a motion to
> compel its disclosure.

(Doc. 166) (citations to the record and footnote omitted) (emphases in original). The defendants filed notice that they responded to Plaintiff's interrogatories (Doc. 157; Doc. 158).

Plaintiff responded to the Court's order (Doc. 167). Plaintiff asserted that he sent letters to the FDOC requesting his discharge papers and requesting the name of the transporting officer who took him from the FDOC to the FCCC. *Id.* at 1-2. He states that he got no response from the FDOC, but that the evidence would have disputed the FCCC's contention that they were not offered Plaintiff's medical records with a proper release. *Id.* Plaintiff claims that he sent a letter to Dr. Spadafora—the ophthalmologist who treated his eyes—to provide him with an affidavit stating that he told Plaintiff that the delay in his treatment contributed to his eyes' deterioration. *Id.* at 3. He asserts that he sent a letter to Dr. Brennan asking for an affidavit that he offered his medical records to Dr. Brennon, but that the doctor refused them, citing FCCC policy. *Id.* Plaintiff also asserts that the FCCC has afforded him a health aid, but the aid is not permanently assigned to him. *Id.* at 3. Although he urges that he is attaching an affidavit from 2014 from this aid, no such affidavit is attached. *Id.*

In his response, Plaintiff also posits—without providing supporting evidence—that the FCCC may not be delivering the mail he sends out (Doc. 167 at 3-4). He complains that he did not file a motion to compel because he did not know what that was and that

he either does not have access to the Federal Rules of Civil Procedure or does not know how to access the rules if they are available.   *Id.* at 4-5.

### III.   <u>Standards of Review</u>

#### a.   **Summary Judgment Standard**

Summary judgment is appropriate only if it is shown "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The Supreme Court has explained the summary judgment standard as follows:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).   The movant may meet this burden by presenting evidence that would be admissible at trial indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some elements of its case on which it bears the ultimate burden of proof.   *Celotex*, 477 U.S. at 322–324.

If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991). Summary judgment is mandated "against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, (1986).

### b.    Deliberate Indifference Standard[4]

Deliberate indifference to the serious medical needs of a prisoner "constitutes the unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *see also Campbell v. Sikes*, 169 F.3d 1353 (11th Cir. 1999).   To state an Eighth Amendment claim for deliberate indifference to a serious medical need, a plaintiff must allege: (1) a serious medical need; (2) deliberate indifference to that need by the defendants; and (3) causation between the defendants' indifference and the plaintiff's injury. *Youmans v. Gagnon*, 626 F.3d 557, 563 (11th Cir. 2010).

"[A] serious medical need is considered 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Farrow*, 320 F.3d at 1243 (citing *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994), *abrogated in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 n.9 (2002)).   In either

---

[4] Plaintiff is not a prisoner. Therefore, his 42 U.S.C. § 1983 claims rest upon his contention that the defendants violated his rights under the due process clause of the Fourteenth Amendment as set forth in *Youngberg v. Romeo*, 457 U.S. 307 (1982), rather than on the Eighth Amendment's "cruel and unusual" clause.   Under *Youngberg*, the involuntarily civilly committed have liberty interests under the due process clause of the Fourteenth Amendment to reasonably safe conditions of confinement, freedom from unreasonable bodily restraints, and such minimally adequate training as might be required to ensure safety and freedom from restraint. *Id.* at 322. The Eleventh Circuit has held that *Youngberg* establishes that the due process rights of the involuntarily civilly committed are "at least as extensive" as the Eighth Amendment "rights of the criminally institutionalized," and therefore, "relevant case law in the Eighth Amendment context also serves to set forth the contours of the due process rights of the civilly committed." *Dolihite v. Maughon,* 74 F.3d 1027, 1041 (11th Cir. 1996).

situation, "the medical need must be 'one that, if left unattended, pos[es] a substantial risk of serious harm." *Id.* (citing *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000) (alteration in original); *see also Andujar v. Rodriquez*, 486 F.3d 1199, 1203 (11th Cir. 2007) (finding that a condition involving more than "superficial" wounds, affecting ability to walk, and pain that caused crying was objectively, sufficiently serious).

In order to establish deliberate indifference to a serious medical need on the part of a defendant, a plaintiff must show subjective knowledge of a risk of serious harm and disregard of that risk by conduct that is more than gross negligence. *Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010).

## IV.  <u>Analysis</u>

### a.  **The defendants are entitled to summary judgment**

Plaintiff asserts that Defendant Lamour "made decisions on Plaintiff's care based on the guidelines set forth by the [corporate defendants] employing him, and not on sound medical judgment." (Doc. 126 at 21).  He asserts that Defendant Lamour was deliberately indifferent and negligent.  *Id.*  He asserts that Defendants GEO, Inc. and GEO Care, LLC, "established procedures, rules and guidelines for the treatment of residents at the facility knowing that medical necessity would not be considered[,] only cost." *Id.*

The defendants assert that summary judgment is appropriate on Plaintiff's deliberate indifference claim because Plaintiff has not produced evidence showing that any perceived delay in his treatment worsened his condition and because the undisputed evidence shows that Defendant Lamour "was extremely attentive to Plaintiff's medical care." (Doc. 162-1).  In support of their motion for summary judgment, the defendants filed Defendant Lamour's affidavit in which he describes the extensive treatment Plaintiff

has received at the FCCC for his eye conditions. The defendants also provide Plaintiff's medical records from his time at the FCCC.

Based upon the pleadings and the evidence before this Court, the following facts regarding Plaintiff's treatment for his eye conditions are undisputed:

Plaintiff arrived at the FCCC on or around April 20, 2012 (Doc. 126 at ¶ 16);

Plaintiff was examined by Nurse Baker on April 25, 2012, and she noted that Plaintiff was legally blind, secondary to Fuch's disorder. She added Plaintiff's name to a list of patients to be seen by non-defendant optometrist Dr. Brennan (Lamour Aff. at 6-7);

Plaintiff was assessed by a dietitian on April 27, 2012 who noted that Plaintiff suffered from Fuch's eye disease (Medical Records at 38);

Plaintiff was seen by Dr. Brennan on June 13, 2012. Dr. Brennan noted that Plaintiff had Fuch's Dystrophy, but did not recommend surgery or recommend that Plaintiff be seen by an ophthalmologist (Doc. 126 at ¶ 19; Medical Records at 37, 39);

Plaintiff was seen by Dr. Brennan again on July 11, 2012. Dr. Brennan noted advanced Fuch's Dystrophy, but again did not recommend surgery or recommend that Plaintiff be seen by an ophthalmologist (Medical Records at 36, 39);

Plaintiff was seen by Dr. Brennan again on December 12, 2012. Dr. Brennan noted that Plaintiff had advanced Fuch's Dystrophy in both eyes and glaucoma in the right eye (Lamour Aff. at ¶ 21). Dr. Brennan prescribed several eye medications and recommended, for the first time, that Plaintiff be seen by an ophthalmologist (Doc. 126 at ¶ 39);

Defendant Lamour approved Dr. Brennan's recommendation, and Plaintiff was seen by non-defendant ophthalmologist Dr. Spadafora on December 21, 2012 (Lamour Aff. at ¶ 24, Doc. 126 at ¶ 42, Medical Records at 92). Dr. Spadafora determined that Plaintiff had advanced glaucoma, Fuch's Dystrophy and cataracts. *Id.* Dr. Spadafora continued Plaintiff on his present medications, started one new medication, and ordered that Plaintiff return in two weeks for

a surgery evaluation (Medical Records at 92; Lamour Aff. at ¶ 26);

Plaintiff visited Dr. Spadafora again on January 9, 2013, and Dr. Spadafora recommended, for the first time, that Plaintiff be scheduled for surgery (Lamour Aff. at ¶ 27; Medical Records at 91);

On February 12, 2013, Dr. Spadafora performed DSEK surgery[5] on both of Plaintiff's eyes and cataract surgery in the right eye (Lamour Aff. at ¶ 30, Medical Records at 86); and

Plaintiff received follow-up eye care and additional surgeries for his eye conditions on February 14, 2013, March 5, 2013, March 7, 2013, April 24, 2013, October 22, 2013, December 11, 2013, January 30, 2014, February 11, 2014, March 18, 2014, April 22, 2014, April 24, 2014, May 1, 2014, May 15, 2014, May 19, 2014, May 29, 2014, June 5, 2014, June 19, 2014, July 21, 2014, August 21, 2014, October 3, 2014, October 23, 2014, November 17, 2014, December 1, 2014, January 5, 2015, January 8, 2015 (Lamour Aff. at ¶¶ 30-34, 39, 40, 41, 43, 45-64; Doc. 126 at ¶¶ 49, 51, 67, 70, 71, 76, 77, 79, 80, 81, 82, 85, 86, 89, 90, 92, 94; Medical Records).

The undisputed record evidence shows that Plaintiff received extensive care for his eye conditions. Plaintiff asserts however, that his constitutional claims are based, at least in part, upon the *delay* in his care caused by Defendant Lamour's failure to accept and review his medical records from the FDOC. He asserts that, had Defendant Lamour accepted Plaintiff's FDOC medical records, he would have seen that at his last

---

[5] Defendant Lamour describes DSEK surgery as:

A cornea transplant technique that replaces only the damaged cell layer instead of replacing the entire thickness of the cornea. The literature notes that the DSEK procedure allows for the cornea to heal much faster and stronger and the patient's visual recovery is better. The literature further suggests that due to the fact that this technique leaves a smoother surface and significantly improves the visual results, it has become the preferred treatment for Fuch's Dystrophy.

(Lamour Aff. at ¶ 28).

optometrist visit while incarcerated, someone had noted "candidate for corneal transplant" in his chart, "the same diagnosis it took the Center over seven (7) months to make." ([Doc. 165 at 3](#)).

Where, as here, medical care is ultimately provided to a plaintiff, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining whether the delay is constitutionally intolerable. *See Brown v. Hughes*, 894 F.2d 1533, 1537–39 (11th Cir. 1990). In cases where the prisoner has suffered increased physical injury due to the delay, the Eleventh Circuit has noted that the courts must consider: (1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay. *Goebert v. Lee County*, 510 F.3d 1312, 1327 (11th Cir. 2007) (citing *Hill*, 40 F.3d at 1189). The question of whether a delay in receiving treatment worsened an individual's condition overlaps with the causation inquiry. *Id.* at 1329. Therefore, to survive summary judgment, a plaintiff must show that a delay attributable to the defendant's indifference likely caused the plaintiff's injury. *Id.* To make such showing, "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Hill*, 40 F.3d at 1188. This Court concludes that the defendants are entitled to summary judgment on Plaintiff's delay-of-treatment claim for five reasons— each of which, standing alone, would be sufficient to grant summary judgment in favor of the defendants.

First, the Court notes that any deliberate indifference claim based upon a delay in the provision of medical care presupposes that a delay actually occurred. Plaintiff has

attached his FDOC medical records to his response in opposition to the motion for summary judgment (Doc. 165-1).   A review of the records shows that Plaintiff was diagnosed with Fuch's Dystrophy at some time prior to October of 2006 (Doc. 165-1 at 3).[6]   He was examined by an FDOC optometrist either yearly or every six months while he was incarcerated in the FDOC.  *Id.* at 4-28.   Prior to April 4, 2012 (only a few days before his release from the FDOC), Plaintiff was examined by an optometrist who, for the first time, wrote in the chart that Plaintiff was a "candidate for corneal transplant."   *Id.* at 28.   However, no surgery was ordered or requested by the FDOC doctor at that time, and Plaintiff was scheduled for a follow-up visit in six months (Doc. 165-1 at 28). Therefore, had Plaintiff remained in the custody of the FDOC, he would have had another optometrist appointment in October of 2012.   However, it is undisputed that Plaintiff had an appointment with FCCC optometrist Dr. Brennon on June 13, 2012—a full four months prior to the scheduled FDOC appointment.   Accordingly, even had Defendant Lamour read Plaintiff's FDOC medical records, he would have had no reason to expedite Plaintiff's appointment with Dr. Brennan, given that the FDOC optometrist recommended a follow-up appointment in six months' time.   Therefore, the record evidence indicates that the actions of the defendants did not cause a delay in Plaintiff's treatment.

Second, even if Defendant Lamour should have accepted and read Plaintiff's FDOC medical records, Plaintiff has not shown that his failure to do so was more than merely negligent.   In other words, Plaintiff has not shown that Defendant Lamour subjectively knew of a risk of serious harm to Plaintiff if he did not read the records, yet deliberately chose to ignore this risk.   Rather, Defendant Lamour's failure to accept and

---

[6] In his amended complaint, Plaintiff asserts that he was diagnosed in 2005, prior to his FDOC incarceration (Doc. 126 at ¶ 2).

read the records and to conclude, from a single handwritten note written by a medical professional with whom Defendant Lamour was unfamiliar, that Plaintiff needed a speedier consultation with Dr. Spadafora, was, at most, negligent.  However, mere negligence or malpractice does not rise to the level of a constitutional violation. *See Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Third, as noted above, a plaintiff seeking to show that a delay in medical treatment rose to a constitutional violation "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Hill*, 40 F.3d at 1188.  Plaintiff has not satisfied this requirement.  Although he asserts that Dr. Spadafora told him his outcome would have differed had he seen him sooner and that permanent damage had occurred due to the high pressure in Plaintiff's eye going untreated, Dr. Spadafora was not deposed and has filed no affidavit.  Accordingly, Plaintiff's statements are merely inadmissible hearsay, and cannot be used to defeat summary judgment. *See Macuba v. Deboer*, 193 F.3d 1316, 1322 (11th Cir. 1999) ("The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment."); *Bush v. Barnett Bank of Pinellas County*, 916 F. Supp. 1244, 1256 (M.D. Fla.1996) ("[H]earsay testimony that would be inadmissible at trial may not be included in an affidavit to defeat summary judgment because a third party's description of supposed testimony is not suitable grist for the summary judgment mill.") (quoting *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995)).  Moreover, even if the Court considers Dr. Spadafora's hearsay statements, they do not satisfy *Hill*'s requirement that a plaintiff show that the defendants caused the detrimental effects.  Plaintiff suffered from Fuch's Dystrophy for at least seven years before he was examined by Dr. Spadafora.   It is logical

that Dr. Spadafora's statements (as set forth by Plaintiff) were directed towards the entire seven-year delay in treatment, and not only towards delay caused by the FCCC.   In other words, Plaintiff has not produced evidence that <u>Defendant Lamour</u> caused Plaintiff's condition to worsen by delaying his treatment.

Fourth, Plaintiff's argument that Defendant Lamour caused an unconstitutional delay in his medical treatment by sending Plaintiff to an optometrist instead of an ophthalmologist for his vision difficulties is simply disagreement with the treatment received.   The undisputed evidence shows that Plaintiff received treatment for his Fuch's Dystrophy and related eye conditions at least thirty-five times in the two and a half years he was at the FCCC before he filed this complaint.   This included numerous outside consultations and six surgeries.   Although Plaintiff clearly preferred different treatment, he does not state a deliberate indifference claim. *See Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) ("Although Hamm may have desired different modes of treatment, the care the jail provided did not amount to deliberate indifference."); *Jackson v. Fair*, 846 F.2d 811, 817 (1st Cir. 1988) ("Although the Constitution does require that prisoners be provided with a certain minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice.").   That Plaintiff would have preferred to see an ophthalmologist instead of an optometrist immediately upon his admission to the FCCC is merely a disagreement with the care he received and does not entitle him to relief.

Finally, even though he conducted discovery against these defendants, Plaintiff has not produced a single piece of evidence showing that the GEO defendants have a policy of denying medical care to FCCC residents based upon considerations of cost.   To the contrary, the undisputed evidence before this Court indicates that no such policy could

have been at play in Plaintiff's case.   Plaintiff does not dispute that he received numerous medical consultations and surgeries at the FCCC's expense; neither does Plaintiff allege that any medical condition went untreated or that Defendant Lamour refused to approve treatment when it was recommended.   Given the quality and magnitude of care provided to Plaintiff, no rational jury could find that any corporate policy regarding Plaintiff's treatment caused his injury or was "sufficiently harmful to evidence deliberate indifference to [his] serious medical needs." *Estelle*, 429 U.S. at 106.   The defendants are entitled to summary judgment on all of Plaintiff's claims. *See Hamm, 774 F.2d at 1575* (noting that the "evidence shows that Hamm received significant medical care while at the jail" and as a result Hamm did not meet his burden of proof to show deliberate indifference).

### b.      Plaintiff will not be allowed to seek additional discovery

Plaintiff seeks leave to conduct additional discovery against certain non-parties to provide evidence that the FCCC has a policy against accepting FDOC medical records and to obtain a statement from Dr. Spadafora that a delay in treatment worsened his condition (Doc. 167).   However, even if Plaintiff was in possession of such evidence, it would not change this Court's conclusion that the defendants are entitled to summary judgment on Plaintiff's constitutional claims.   As noted, there is little indication that Defendant Lamour's alleged failure to accept Plaintiff's FDOC medical records contributed to any perceived delay in his treatment.   In addition, even if Plaintiff could show that there was a delay and that such delay worsened his condition, this amounts to, at most, medical negligence, which is not cognizable under 42 U.S.C. § 1983.

ACCORDINGLY, it is hereby

**ORDERED:**

1.      The defendants' motion for summary judgment (Doc. 160) is **GRANTED**.

2.    Plaintiff's request to conduct additional discovery (Doc. 167) is **DENIED**.

3.    The **Clerk of Court** is directed to terminate any pending motions, enter judgment in favor of the defendants, and close this case.

**DONE** and **ORDERED** in Fort Myers, Florida on this 5th day of May, 2017.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

SA: OrlP-4
Copies: Richard Angus Bradley
Counsel of Record